Judgment rendered April 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,490-WCA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JOHN J. TOMBRELLO                                       Plaintiff-Appellee

versus

STATE OF LOUISIANA                                      Defendant-Appellant
THROUGH LSUHSC

* * * * *

Appealed from the
Office of Workers' Compensation, District 1W
Parish of Caddo, Louisiana
Trial Court No. 2101771

Meagan Elyse Shadinger
Workers' Compensation Judge, *Ad Hoc*

* * * * *

LIZ MURRILL                                             Counsel for Appellant
Louisiana Attorney General

DAVID E. BORAKS
E. DAVID GILMER
Assistant Attorneys General

THE LAW OFFICES                                         Counsel for Appellee
OF ALEX S. LYONS
By: Alexander S. Lyons

* * * * *

Before COX, ROBINSON, AND MARCOTTE, JJ.

**COX, J.**

This case arises out of the Office of Workers' Compensation in District 01W in Caddo Parish, Louisiana. The State, through Louisiana State University Health Science Center ("LSUHSC"), has appealed from a judgment that found Claimant, John Tombrello ("Tombrello"), was permanently disabled and unable to engage in any employment and granted $874.41 in biweekly disability benefits. For the following reasons, the WCJ's ruling is reversed.

## FACTS

On March 30, 2021, Tombrello filed a Disputed Claim for Compensation Form, seeking judgment for permanent and total disability arising from a work-related accident on June 30, 2011. Tombrello alleged that as a result of the altercation, he suffered psychological injuries, namely PTSD, has not been employed since 2011,[1] and sought compensation for the disability. LSUHSC filed responsive pleadings denying the allegations and asserted that Tombrello was not permanently and totally disabled. LSUHSC maintained that Tombrello received worker's compensation benefits as a result of the accident; but, a further award for permanent disability should be denied.

A hearing on the matter was held on October 20, 2022, wherein the following testimony was adduced:

In recalling the incident, Tombrello first testified that on June 30, 2011, he was employed through LSUHSC and was on patrol in the ER

---

[1] Tombrello notes he was referred for vocational assessment on July 28, 2020, but his case worker, Marcy Carney ("Carney"), was unable to find work for Tombrello and was instructed to close her file in January 2021.

during the midnight shift, where he was responsible for securing the area, as well as any patients or staff. Tombrello explained that this shift had fewer officers, and there were only three or four officers on duty that night. Tombrello stated that during his shift, he received a call from Shreveport Police Department that officers were bringing in a combative patient. Tombrello testified that when officers arrived, they told him that the patient was handcuffed because he had been unruly and fought them, and the patient would need to be seen in the ER before he could be evaluated on the psychiatric floor.

Tombrello stated that the ER nurse who performed the initial triage on the patient asked him to remove the patient's handcuffs so she could take his blood pressure. Tombrello stated that he refused to remove the handcuffs until he spoke with his supervisor because of the information relayed by the officers. Tombrello testified that even after he told his supervisor that the patient had been combative with officers, he was still ordered to remove the handcuffs. Tombrello stated that he expressed his apprehension about removing the restraints but followed orders and removed the handcuffs. Tombrello explained that when he first removed the handcuffs, the patient was calm and allowed the nurse to take his vitals, but after the nurse stated that the patient would have to be taken back for an evaluation, the patient gave a "smirk."

Tombrello stated that as he approached, the patient started "swinging" and hitting him. He explained that during the altercation, he felt something wet, and realized the patient urinated, defecated, and repeatedly spat on him multiple times. Tombrello stated that he eventually secured the patient, but as he escorted the patient toward a back room, the patient fought him again.

2

He explained that Doctor Patrick McGauly ("Dr. McGauly"), the ER doctor, helped him restrain the patient in a secure room. Tombrello stated that the patient continued to spit on him until Dr. McGauly put a "spit hood" on the patient. Tombrello explained that throughout the altercation the patient repeatedly threatened him and stated "I already got one of you [expletive]. I've got AIDS and syphilis and everything else." Tombrello stated that after Dr. McGauly confirmed this information, he was instructed to shower and start preventative medication.

Tombrello stated that he got "worked up" after hearing this and was kept in the ER until his shift ended. He stated that after the incident, he took two days off from work and reported to occupational health. Tombrello testified that when he returned to work, he was placed back on patrol in the ER, and he was stressed and nervous because he would have to be in contact with patients again. He stated that during his return, he experienced hot flashes, nausea, sweats, malaise, and general stress. Tombrello testified that Dr. McGauly had him taken off work until he could be evaluated by a psychiatrist. Tombrello stated that he chose Doctor Mark Vigen ("Dr. Vigen") to evaluate him because Dr. Vigen and his office evaluated him in the past for his job as an officer. He also stated that he was referred to Doctor Patrick Sewell ("Dr. Sewell") for medication management and therapy, where he attempted several techniques that did not seem to work.

Tombrello stated that he was aware that the goal of his therapy was to help him return to work, and part of therapy involved him volunteering to help him get used to large crowds of people. Tombrello stated that he volunteered at several different places, including a local school and Shriners Hospital, but ultimately, he was unable to cope with the environments

3

because of the crowds, noise, and overall rowdiness. He also stated that he had a difficult time enjoying hobbies such as fishing because the potential for water splashing on him reminded him of the incident. Tombrello testified that he continued to work with Dr. Vigen and Dr. Sewell, but he still often has dreams about the incident, struggles with his anger, and has become hypersensitive to sounds and smells; moreover, when he does go out, he avoids large crowds.

Tombrello further testified that when he returned to work, he requested light duty with no contact, but was informed there "was no such thing as light duty," and was placed back on patrol in the ER. Tombrello stated that Dr. McGauly informed his supervisor that Tombrello developed anxiety and was not fit for duty. Tombrello stated that he had not been back to work after his last shift and was eventually terminated. On cross-examination, Tombrello clarified that he was tested for HIV, Syphilis, and Hepatitis-B and that the tests came back negative. However, he expressed that HIV could lie dormant for 10 years or more and he was concerned that he would test positive in the future.

Tombrello then detailed his previous jobs, which included a position with Caddo Fire District, Caddo Sheriff's Office, and the Air Force, with an honorable discharge. Tombrello then stated that he currently sees Dr. Vigen and that he was also evaluated by Doctor Tiffany Jennings ("Dr. Jennings"), who attempted dialectical behavior therapy with him, but the treatment was unsuccessful. Tombrello then testified that he has lived with his brother for the past five years and helps his brother by cooking, cleaning, shopping, and taking care of the home. Tombrello stated that he also volunteers to take care of his neighbor's yard. He then testified that he has tried to regain his

4

normal life by attending football games for his godchildren but struggles with the noise and large crowds. Tombrello further stated that he has cameras around his home because he was worried about someone breaking into his home.

Next, Dr. Vigen testified that he was a psychologist in Shreveport and that he started therapy sessions with Tombrello in August 2011. Dr. Vigen stated that there was nothing in Tombrello's history to suggest that he previously struggled with his mental health or had a psychological disability. Dr. Vigen testified that when he started therapy with Tombrello, his goal was to help Tombrello return to work, and he initially suggested that Tombrello return but under light duty, if possible. He stated that Tombrello was ultimately returned to the same post and he noticed that Tombrello had an increase in anxiety, so he removed Tombrello from work.

Dr. Vigen testified that a major portion of Tombrello's identity was rooted in being an officer, and following his termination and loss of his certification, he lost a sense of self and, in turn, suffered from anxiety, shame, and depression. Dr. Vigen stated that to help, he referred Tombrello to Dr. Sewell for medication management and high movement desensitization grief processing. Dr. Vigen noted that after Dr. Sewell stopped seeing patients, Dr. James Harrold and Dr. Stephens took Tombrello as a patient and diagnosed him with PTSD and generalized anxiety. He further noted that in June 2020, Tombrello started therapy with Dr. Anshuman Jyoti ("Dr. Jyoti") who also diagnosed Tombrello with PTSD and generalized anxiety.

Dr. Vigen then testified that during his own treatment with Tombrello, he attempted eye movement desensitization and reprocessing ("EMDR"),

5

and dialectical behavior therapy ("DBT") was attempted with Dr. Jennifer Russell for 10 sessions to no avail. Dr. Vigen noted that Tombrello tended to isolate himself from others, so he encouraged him to volunteer to become acclimated to crowds again; however, several attempts, such as working as a crossing guard or with Shriners, were not successful. Dr. Vigen further testified that Tombrello also expressed that he started hearing voices and felt as if someone was shooting at him, and began keeping guns in every room of his home until he accidentally pointed his gun at his brother.

Dr. Vigen explained that this behavior was normal for those diagnosed with PTSD because they tend to avoid large crowds. He further explained that under the revised DSM-5, diagnosis for PTSD was more rigorous, as a patient would have to be exposed to trauma, defined as actual or threatened death, serious injury, or sexual violence. Dr. Vigen stated that, in his opinion, Tombrello being intentionally exposed to HIV qualified as an exposure to death as it could have been actual or threatened, and had a temporal relationship with the trauma and onset of symptoms Tombrello suffered. Dr. Vigen stated that Tombrello continued to suffer from the symptoms for the past 11 years.

Dr. Vigen described Tombrello as hypervigilant, rageful at times, prone to outbursts, has intrusive memories, and has distressing dreams and nightmares. He explained that Tombrello had several triggers that reminded him of the incident such as large crowds, the possibility that he could be spat on, loud or excessive chewing, and public restrooms. Dr. Vigen explained that this behavior was an impediment to him returning to work and did not believe that Tombrello was capable of returning to work in any position where he would have to be exposed to the public.

On cross-examination, Dr. Vigen testified that Tombrello was placed on several medications such as mood stabilizers, antidepressants, and anti-anxiety pills, and that the medication was semi-successful. Dr. Vigen testified that Tombrello had not made as much progress as he would have liked, but he would continue to work with him. Dr. Vigen reiterated that EMDR and DBT were attempted with Tombrello, but that both treatments were unsuccessful, and he did not believe that trying the same treatment again would be effective. Dr. Vigen explained that Tombrello was not in a position to return to work at that time, which included remote work because he did not have the best computer skills and would have to be trained.

Dr. Vigen acknowledged that Tombrello received some information management and computer skills through the Air Force but was unsure of the extent of that training. Dr. Vigen also testified that he did not believe Tombrello had any physical limitations that prevented him from working, but noted that an evaluation concerning that particular matter was outside the scope of his field. Finally, Dr. Vigen testified that as it stands, Tombrello was unemployable but had hopes that he could return to work and increase his quality of life.

On December 1, 2022, the worker's compensation judge ("WCJ"), in its written reasons for judgment, found that Tombrello proved by clear and convincing evidence that he was unable to engage in any employment or self-employment. The WCJ specifically provided that "there [was] not a reasonable probability that [Tombrello] may be rehabilitated to such an extent that he can achieve gainful employment." LSUHSC now appeals.

7

## Standard of Review

Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. *Harris v. City of Bastrop*, 49,534 (La. App. 2 Cir. 1/14/15), 161 So. 3d 948, 957; *State, DOTD v. Berry,* 49,186 (La. App. 2 Cir. 8/13/14), 147 So. 3d 270. Factual findings in workers' compensation cases are subject to the manifest error standard of review. *Id.*; *Buxton v. Iowa Police Dept.*, 09-0520 (La. 10/20/09), 23 So. 3d 275. Under this standard, the reviewing court does not decide whether the workers' compensation judge was right or wrong, but only whether the judge's findings are reasonable. *Buxton v. Iowa Police Dept.*, *supra*. The manifest error standard applies even when the WCJ's decision is based on written reports, records, or depositions. *Harris v. City of Bastrop*, *supra*.

The reviewing court is not permitted to reweigh the evidence or reach its own factual conclusions from the record. *Marange v. Custom Metal Fabricators, Inc.*, 11-2678 (La. 7/2/12), 93 So. 3d 1253. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own inferences and evaluations are as reasonable. *Harris v. City of Bastrop*, *supra*. Where there exist two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.*

In *Arceneaux v. Domingue,* 365 So. 2d 1330 (La. 1979), the Louisiana Supreme Court set forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court

must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. *See also Ardoin v. Firestone Polymers, L.L.C.*, 10-0245 (La. 1/19/11), 56 So. 3d 215.

## DISCUSSION

In its two assignments of error, LSUHSC argues that the WCJ erred in concluding that Tombrello is permanently and totally disabled. LSUHSC alleges that Tombrello failed to prove by clear and convincing evidence that he was permanently disabled, unable to engage in any employment or self-employment, or that rehabilitation was improbable in order to achieve suitable gainful employment.

Specifically, LSUHSC asserts that Tombrello is only 53 years old, graduated from high school, served 17 years in the Air Force where he trained in computer information management, is able to cut not only his own grass, but his neighbor's grass as well, cares for his disabled brother, and carries out daily tasks, including grocery shopping and cleaning. LSUHSC further argues that according to Dr. Jennings' assessment, the extent of Tombrello's disability was unknown and it was possible for Tombrello to make additional progress through therapy if his resistance to treatment was addressed. LSUHSC maintains that without a full exploration of rehabilitation and therapies unique to Tombrello's condition, a finding of permanent disability was premature.

An injured employee may be entitled to permanent total disability ("PTD") benefits when he sustains a very serious or catastrophic injury that renders him unable to return to work in any capacity. La. R.S. 23:1221(2). As set forth in La. R.S. 23:1221(2)(c), when an employee is not engaged in any employment or self-employment, compensation for permanent total

9

disability "shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment."

The clear and convincing standard in a workers' compensation case is an intermediate standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard. *Allen v. Graphic Packaging Int'l, Inc.*, 51,080 (La. App. 2 Cir. 1/11/17), 211 So. 3d 1219, *writ denied*, 17-0426 (La. 4/24/17). To prove a matter by clear and convincing evidence means to demonstrate that the existence of the disputed fact is highly probable or much more probable than its nonexistence. *Id.* Absent any evidence to support the notion that a workers' compensation claimant will be forever disabled, or is unable or unwilling to learn a new compensable skill or polish the old one he already has, every procedural precaution must be taken to ensure that claimant is not prematurely declared permanently and totally disabled. *Id.*; *Comeaux v. City of Crowley*, 00-928 (La. App. 3 Cir. 12/6/00), 773 So. 2d 899, *aff'd on other grounds*, 01-0032 (La. 7/3/01), 793 So. 2d 1215.

In *Comeaux*, the Louisiana Supreme Court held that La. R.S. 23:1221(2)(c) requires consideration of the claimant's physical condition, wage earning ability, and unsuccessful rehabilitative efforts including the

claimant's educational level and ability to be educated. *Comeaux v. City of Crowley*, 01-0032 (La. 7/3/01), 793 So. 2d 1215.

Moreover, La. R.S. 23:1226(D) provides that before a claimant is found to be permanently and totally disabled, it shall be determined "whether there is reasonable probability that, with appropriate training or education, the injured employee may be rehabilitated to the extent that such employee can achieve suitable gainful employment and whether it is in the best interest of such individual to undertake such training or education." The requirement of La. R.S. 23:1226 must be construed in *pari materia* with La. R.S. 23:1221(2). *Allen*, *supra*. Unsuccessful rehabilitation attempts, including the lack of ability to be educated or retrained, along with physical incapacity, are proper factors to consider in determining whether a claimant proved his permanent and total disability. *Id*.; *Comeaux*, *supra*.

In the present case, there is no dispute as to the incident leading up to this matter or that Tombrello was diagnosed with PTSD. The only inquiry is whether Tombrello's diagnosis is so disabling that it renders him permanently and totally disabled and he is unable to engage in any form of meaningful employment. The WCJ found that Tombrello was entitled to PTD benefits based on the assessments from Dr. Vigen, Dr. Jyoti, and LSUHSC's psychologist, Dr. Jennings. Additionally, the WCJ also considered the findings from the vocational case worker, Carney. Specifically, the WCJ provided, in part:

> During his treatment of Officer Tombrello, it is clear that Dr. Vigen has done his best to try and help him overcome his psychological issues with the hopes of eventually returning to work. However, Dr. Vigen has now opined that Officer Tombrello is incapable of returning to work. Dr. Jyoti, Officer Tombrello's treating psychiatrist, has also opined that he is incapable of returning to work. Dr. Jyoti and Dr. Vigen have

11

both diagnosed Officer Tombrello with PTSD, generalized anxiety disorder[,] and major depressive disorder. Dr. Jyoti and Dr. Vigen both agree that Officer Tombrello has a poor prognosis and will continue to remain unable to return to work in any capacity. The State's psychologist, Dr. Jennings, examined Officer Tombrello and agreed with the findings of Dr. Jyoti and Dr. Vigen. Lastly, Officer Tombrello was referred for vocational assessment on July 28, 2020; however, it was determined that no realistic job existed and his [file] was closed.

However, a review of the record does not support the WCJ's findings based on the aforementioned information. First, this Court notes that while Dr. Vigen, Dr. Jyoti, and Dr. Jennings all concluded that Tombrello suffers from PTSD and has a "poor prognosis," none of the doctors reached a definitive finding that Tombrello was permanently and totally disabled. On the contrary, at trial, Dr. Vigen stated that he remains hopeful that Tombrello would be able to improve and "put this behind him, and that that may open opportunities for him." Dr. Vigen further testified that he would continue to treat Tombrello and make as much progress as possible, and noted that Tombrello was willing to make progress in various areas.

Moreover, in response to whether Tombrello would be "dealing with this the rest of his life," Dr. Jennings stated in her deposition, "So the question of is this going to be lifelong I don't think has been fully answered in therapy," because many of his barriers to improvement, such as his anger or resistance to therapy, did not appear to be properly addressed in therapy with Dr. Vigen to determine if the diagnosis was permanent. Dr. Jennings' notes specifically indicated that Tombrello's anger and resistance were never "challenged by any of his providers nor was there any documentation of an attempt to assist in problem solving the underlying etiologies of this

12

resistance," which would have been "helpful to allow Mr. Tombrello an opportunity to address the resistance and possibly make gains in therapy."

Further, regarding Tombrello's potential ability to work or to engage in meaningful employment, the WCJ concluded that "the probability that Tombrello will return to work was low." This decision was based, in part, on the vocational assessment Tombrello underwent on July 28, 2020, and conclusions from Dr Vigen, Dr. Jyoti, and Dr. Jennings.

With respect to the findings from the vocational assessment, the WCJ provided that "no realistic jobs existed and his [file] was closed." However, a review of the record does not support this conclusion. Specifically, the notes and documents from Carney, the vocational assessor, reveal that on January 14, 2021, Tombrello's file was closed, but no further explanation was provided regarding that decision. Moreover, previous notes and documents reflect that Carney only seemed to conclude that Tombrello could not return to his previous employment as an officer, not that there were no suitable forms of employment available to him. Rather, Carney's case plan indicated that Tombrello would continue vocational testing, identification of transferable skills, and establish return to work restrictions with his doctors.

With respect to the conclusions from Tombrello's doctors concerning his potential ability to engage in any form of employment, the WCJ provided that "Dr. Jyoti and Dr. Vigen both agree that Officer Tombrello has a poor prognosis and will continue to remain unable to work in any capacity," and that "Dr. Jennings, examined Officer Tombrello and agreed with the findings of Dr. Jyoti and Dr. Vigen." The WCJ also expressed, in terms of employment, that Tombrello was "at a high risk for injuring himself or

13

others." However, we once again find that the record does not support this conclusion.

First, Dr. Vigen testified at trial that Tombrello was unable to return to work at *the present time* and that *as it stood* as of the date of trial, Tombrello was unable to return to work. Dr. Vigen made no definitive conclusion whether Tombrello would be able to return to work in the future or even if self-employment, where Tombrello could have reduced contact with the public, was an available or viable option. Dr. Vigen, however, did testify that, for five years Tombrello cared for his brother, despite some issues that bothered him, such as smacking or noises when his brother ate.

While Dr. Vigen also expressed concern for Tombrello returning to the workforce because of his anger, he testified that Tombrello's medication has been "semi-successful," that he has not acted out against anyone, has maintained a relationship with his godchildren, has had a reduction in dreams/nightmares, and has allowed Dr. Vigen in his home where he has not previously allowed anyone else. Similarly, Dr. Jyoti stated in his deposition that Tombrello's medication helped him maintain his current mood level and kept his anxiety under control.

Likewise, Dr. Jennings testified that she did not believe that other forms of employment in settings where there is reduced interaction with the public were explored. Dr. Jennings stated that persons with PTSD do better in such settings and that this option "needs to be explored because, like I said, a lot of folks that I have worked with with PTSD have done better in those kind of settings than with the general public."

Under these facts and the record before this Court, we find that there was no definitive or equivocal evidence that Tombrello is permanently

14

disabled. Given the aforementioned testimony, it is clear that Dr. Vigen has expressed that there is a potential for Tombrello to improve and increase his quality of life and rejoin the workforce. Moreover, testimony reflects that because not all issues and resistances to therapy were properly addressed, it cannot be determined whether Tombrello is permanently disabled.

Further, testimony has reflected that not all forms of employment, particularly, self-employment as provided in La. R.S. 23:1221(2)(c), were explored as viable options for Tombrello before any determinations were made regarding his ability to return to work. While we acknowledge the concerns regarding Tombrello's anger, testimony has revealed that Tombrello's medication has improved his temperament, and that, regardless of his triggers, he has nevertheless made progress with his diagnosis. Particularly, Tombrello is able to and has cared for his brother for five years despite frustrations and triggers that arise from that care, has a relationship with his godchildren, has volunteered with the public, and has cut his neighbor's lawn at times. While Tombrello's progress with his diagnosis may be slow, the record before this Court does not reflect the permanency of his condition or the inability to return to the workforce in some capacity.

For these reasons, we cannot say that Tombrello is permanently disabled and cannot engage in some form of gainful employment in the future.

## CONCLUSION

For the reasons stated herein, the WCJ's finding of permanent and total disability is respectfully reversed. Costs of this appeal are assessed to Tombrello.

**REVERSED.**

15